[Civ. No. 1044.   Third Appellate District.—June 2, 1913.]

## GEORGE M. SOUZA, Respondent, v. ANTONE JOSEPH, Appellant.

LANDLORD AND TENANT—BREACH OF COVENANT TO MAKE IMPROVE-MENTS—ACTION BY TENANT.—In this action by a lessee of property to be used as a dairy farm, for the recovery of damages resulting from the lessor's breach of contract to construct buildings and make improvements on the premises necessary for properly carrying on the enterprise, the evidence supports the findings that the lessor unreasonably delayed the performance of his agreement and that the lessee was therefore justified in abandoning the lease.

ID.—WILLINGNESS OF LESSOR TO PERFORM AFTER UNREASONABLE DE-LAY.—After a long and unnecessary delay by the lessor in providing the lessee with the facilities for properly carrying on the enterprise, the lessee was not bound to remain even though, at the time he quit, the defendant was manifesting a willingness to do the things he had agreed to do.

ID.—LESSOR'S BREACH OF COVENANT—QUESTIONS FOR TRIAL COURT.—It was for the court to decide from all the facts whether the defendant had acted with reasonable promptness in keeping his covenants, and whether, under all the circumstances, the plaintiff was justified in abandoning the contract.

ID.—LIQUIDATED DAMAGES—LIABILITY OF LESSEE.—The lessor cannot avail himself of a provision in the lease for liquidated damages in case of a breach by the lessee, when the impossibility of performance was created by the lessor himself.

WITNESS—REFRESHING MEMORY—INSPECTION OF WRITING BY ADVERSE PARTY.—Where a witness is about to refresh his memory from a memorandum book, it is error for the court to deny the right of the adverse party to see the writing and cross-examine the witness upon it. But such error in this case was not prejudicial.

ID.—CROSS-EXAMINATION—LIMITING NUMBER OF QUESTIONS.—There was no error in this case in limiting the number of questions to the plaintiff on cross-examination on a particular point.

ID.—RE-EXAMINATION—DISCRETION OF COURT.—It is within the discretion of the court to refuse a re-examination of matters once fully gone into on cross-examination.

APPEAL—ERRORS NOT MENTIONED IN BRIEF.—Errors assigned in the specifications do not demand consideration by the appellate court when not mentioned in the appellant's brief.

APPEAL from a judgment of the Superior Court of Siskiyou County and from an order refusing a new trial. Jas. F. Lodge, Judge.

The facts are stated in the opinion of the court.

James F. Farraher, and James R. Tapscott, for Appellant.

Taylor & Tebbe, for Respondent.

CHIPMAN, P. J.—Plaintiff brings the action to recover damages for the alleged breach by defendant of a written contract between plaintiff and defendant, dated February 1, 1910.

Plaintiff had judgment for $1,245.10, from which and from the order denying his motion for a new trial defendant appeals.

The contract is a lease by defendant (named as first party) to plaintiff (second party) for the term of four years from its date, of defendant's farm of one thousand seven hundred and twenty acres of land situated in Siskiyou County, together with the livestock and other personal property particularly described in an inventory attached to the contract. In addition to the personal property covered by the inventory,

first party was to procure and deliver to second party eighty milch cows "to be mutually selected by the parties." It was also provided that "in addition to the buildings now upon said farm said first party is to have constructed thereon at a suitable site and as soon as practicable a dairy building to consist of cement flooring and walls and suitable roofing, and is to convey water to same through pipes from a gravity source, and is also to construct thereon at suitable site a barn to consist of a main building for hay, with sheds on each length side thereof for eighty dairy cows, affording three feet frontage space for each cow, and to place therein suitable stanchions and flooring. Said barn is to be equipped for Jackson forks." First party was also to construct a bunkhouse for housing "from eight to ten workmen and to fit the same with proper flue and warming stove"; he was also "to furnish a separator with steam facilities for the operation thereof at a cost not to exceed $350.00," second party to install the same. First party also was to "furnish all material proper and necessary for the repair of the existing fences and material for such new fences as the parties may elect to constru .t." First party was to furnish "such new farming implements as may be necessary for the proper conducting of said farm." The foregoing are the principal covenants on the part of defendant the alleged violation of which was the burden of plaintiff's complaint.

The agreement of plaintiff was "to enter at once into possession of the farm and personal property and conduct therewith a general farming and dairying business"; he was "to do the necessary excavating for the construction of said dairy and for the carrying of the pipes to convey the water to same" and "supervise and assist in constructing said dairy and conveying said water thereto" and also to "assist in the construction of said cow barn"; he also agreed to take proper care of all said property and to so farm said lands "as to make them profitably productive to the parties"; to replant the hay land where necessary and to conduct said business "in a first-class and dairyman-like way," dispose of the surplus product and collect the proceeds and pay over to defendant one-half thereof, retaining for himself the remaining one-half. To insure the faithful performance of the contract by plaintiff he further agreed that "if from any cause it

becomes impossible for him to fulfill his covenants hereunder that he will pay to first party the sum of $2,000.00, as liquidated damages for his failure in said regard and thereupon this agreement shall become canceled and void." It was also provided that, upon the termination of the agreement, plaintiff should "deliver back" to defendant said personal property "in number, kind and quality and condition as nearly as possible, . . . subject to such deterioration as shall result from reasonable use thereof"; also that plaintiff "will devote his best energies and abilities towards handling, conducting and operating said property as mutually profitable and advantageous as possible" and he agrees "to act towards" defendant "with the utmost good faith to the end that the enterprise shall be mutually profitable." It was further provided that "teams and wagons to convey the material for construction of said new buildings on said farm are to be furnished therefrom by said second party but the drivers therefor are to be furnished and paid by said first party. All other material and appliances to be furnished by said first party are to be conveyed to said farm from store, railway station or mill by said second party."

The foregoing covenants on plaintiff's part, which defendant alleges were violated by plaintiff, furnish the basis of defendant's defense and the ground for his cross-complaint in which he claims two thousand dollars, under the clause for liquidated damages, and also five hundred dollars which he alleges is one-half the proceeds of sales of farm products made by plaintiff. Defendant denied specifically the alleged breaches of the contract on his part.

The cause was tried by the court without a jury and the findings of fact were: That plaintiff had performed the obligations of the contract on his part; that defendant, "though often requested by plaintiff to erect said dairy building and the said barn and said sheds for said dairy cows as contemplated in said contract, refused and neglected to perform his said contract in that respect"; that, on May 27, 1910, "defendant had not made any arrangements to build any barn upon said place as contemplated in said contract"; that there was a barn on the place capable of storing about four hundred tons of loose hay; that the annual crop of hay was at that time ready to be cut; that defendant occupied

said barn with hay belonging to himself to the amount of two hundred tons and though often requested to remove said hay to make room for said new crop, defendant refused to remove said hay; that the farm produced about five hundred tons of hay and said barn was necessary for the housing of the same and "it was also necessary for the erection of a new barn as contemplated in said contract for the housing of said hay for the year 1910"; that defendant furnished said separator and engine and boiler to run the same, but defendant "never did build, nor cause to be built, any building in which said separator and boiler and engine were to be placed, and thereafter removed said boiler and engine and disposed of said separator and did not begin the erection of said creamery building as contemplated by the terms of said contract" and "that said dairy building and said facilities for running the same should have been supplied long prior to the month of May, 1910"; that defendant, though often requested to furnish material for the repair of fences and for new fences, refused and neglected to do so; that he also failed to furnish the necessary farming implements. It was further found: That, in April, 1910, there were purchased eighty cows which were delivered to plaintiff and that "it was necessary in order to care for said cows and to run the creamery as contemplated in said contract, that facilities for taking care of said cows, and the milk and cream, the product of said cows, that there should be a building that could be used as a creamery and a barn with stalls for each of said cows . . . and said facilities should have been provided by defendant without any delay. That disregarding his said contract, defendant refused to take any steps, though repeatedly and constantly urged by plaintiff, to make the necessary provision for taking care of said product. That there was no place upon said farm where the said cows could be properly taken care of; nor any place that could serve as a creamery to take care of the said milk and cream, the product of said cows; that by reason of the said acts of defendant in refusing and neglecting to carry out his said contract, it was impossible for plaintiff to carry out the said contract on his part." It is further found: "That plaintiff expended four months of labor in preparing to operate said farm under said contract and in working upon said farm; that plaintiff

expended in the purchase of material and hiring of men under said contract, in excess of the receipts for produce sold, the sum of $795.10; that it cost plaintiff to move his family upon said farm the sum of $50.00; that plaintiff was an experienced dairyman and the value of his services for the four months he was engaged on said farm, under said contract, was of the value of $400; that the acts of defendant caused plaintiff damage in the sum of $1245.10, no part of which has been paid to plaintiff; that plaintiff kept a true and correct account of all his expenditures and receipts in conducting said farm and was ready and willing at all times to account to defendant, and never refused to account to defendant; that none of the acts of plaintiff herein has caused defendant any damage whatever."

"As conclusions of law from the foregoing facts the court holds that plaintiff is entitled to judgment against defendant and to recover of defendant the sum of $1245.10, together with costs of suit."

The provisions of the contract and the findings of fact will sufficiently suggest the issues without stating the averments of the pleadings.

1. Numerous errors of law are assigned in the rulings of the court at the trial, but the principal ground urged for a reversal of the judgment is the insufficiency of the evidence to support the findings of fact.

It appears that plaintiff moved to the farm with his family on February 9, 1910, and at once entered upon the farming operations devolving upon him under the contract. He continued so to do until May 27, 1910, when he abandoned his lease and the possession of the farm. Whether he was justified in this course is the main issue in the case. While there were some other provoking causes of some importance, the ones chiefly put forward by plaintiff were defendant's failure to build the cow and hay barn and the dairy building.

The contract provided that defendant was "to construct thereon (upon said farm) at suitable site a barn to consist of a main building for hay, with sheds on each length side thereof for eighty dairy cows, affording three feet frontage space for each cow, and to place therein suitable stanchions and flooring." Plaintiff's duty, as provided by the contract, was "to supervise and assist in the construction of said cow

barn.'' The farm hitherto had been conducted as a grain, hay, and stock farm. The contract contemplated turning it into a dairy farm and provided that plaintiff was to receive from defendant, ''on or before May 1, 1910, eighty milch cows.'' Plaintiff testified that forty cows were bought in March and the balance, it appeared, were delivered in April. Plaintiff testified that he started to ship cream April the 10th and shipped till May 27th.

There was evidence that the hay crops usually amounted to about five hundred tons. There was a hay barn on the place of about three hundred tons storage capacity. Defendant had in it about two hundred tons of hay which had not been removed at the time plaintiff gave up the farm. The evidence showed the alfalfa hay was ready to be cut, but the wild grass hay was not yet fit to cut. There was evidence that plaintiff had frequently and urgently insisted upon the completion of the new hay and dairy barn in time for its convenient use in handling the cows and to store hay, and, also, that defendant should remove his hay from the old barn in time to receive the new hay crop and should complete the dairy building. The contract provided that defendant was to construct ''at a suitable site and as soon as practicable a dairy building to consist of cement flooring and walls and suitable roofing, and is to convey water to same through pipes from a gravity source.'' Plaintiff was ''to do the necessary excavating for the construction of said dairy and for laying of the pipes to the same to convey the water to same at his own cost and expense and is to supervise and assist in constructing said dairy and conveying said water thereto.''

It is quite apparent that the parties regarded these buildings as necessary to the proper and economical operation of the dairy branch of the farm which was to be its chief source of income. The contract itself implies as much and the evidence confirms this implication. It is not contended by defendant that less than full compliance with his covenants would have given plaintiff the equipment required to profitably and satisfactorily perform his part of the contract. Defendant's contention is that a reasonable time was implied in which to do the things he had agreed to do, and in this contention he is doubtless correct. Defendant testified that he did not give an order for the lumber to build the hay and

dairy barn until two weeks before plaintiff left the place and about the same time he sent a man into the woods to cut timbers for the barn. He bought cement for the dairy building on March 26, 1910, but he did not commence to build until a few days before plaintiff gave up his lease and after he had been notified by plaintiff that he intended doing so. Plaintiff testified that he had many times urged defendant to erect these buildings, but could get no satisfactory answer as to when he would commence work.

Witness Perry went to work for plaintiff on April 21 and remained until plaintiff left. He was asked to state what kind of a place they had for milking the cows. He testified: "There was an old corral there, it used to be the lassoing corral, made out of rails and old boards. That was the only corral there, they made it a little bigger, throwed the fence out a little further, made it a little bigger so they could get the cows in it. It was in pretty bad shape to milk cows in. That was the only corral there and the only place they had to milk cows in. There was no dairy barn there when I left, and none started. There was an old barn there—there was two barns there. The stable, horse barn—and there was that big barn where they kept hay—it was two-thirds full of hay. . . . Q. What kind of a place did they have to take care of the cream there? A. Had an old shed there along the barn, they told me it was a barn they used to put a stallion they had there before they had the old shed alongside of that—where they had the separator it was in pretty bad shape. It wasn't a fit place to take care of milk, it didn't have a good floor on, the old boards were muddy all the time there. It was right close to the dirt there, it was always muddy in there."

Witness Silva went to work on the place March 5, 1910, and remained there until May 26th. He had worked in a dairy and was a milker. He testified: "Q. Now how about a place to take care of the cream and milk? A. Why, it was a pretty bad place. It was a little shed—there was a little barn there and a shed on one side of it where they had the separator. It was in a pretty dirty condition. Awful poor place to have a separator in. It wasn't any place in my judgment to take care of milk and cream.. That continued all the time while I was there. Q. In your judgment as a dairyman you wouldn't want to continue in business any longer

than you could possibly help? A. No, sir. It was an awful warm place and caused milk and cream to get sour—couldn't keep it clean because there were holes in the roof and the wind would blow there, blow dust in the milk. The building was dirty inside. There was no new cow barn built while I was there, nor was there any lumber brought there to build any such barn when I was there."

Plaintiff testified: "When we bought first cows I told him bargain them cows, don't take them before I got machinery up and dairy building—what we done was took cows in before that machinery put in. . . . Q. Did you kick at the proposition—did you tell Antone not to do that? A. Not to take cows, I didn't like it—I don't kick then on that, but I want him to have dairy up that time. I tell Antone Joseph—I heard him make the agreement—not to get the cows before the 1st of April to the 15th." There was no evidence that the delay in erecting the dairy building or the hay and cow barn was caused by any failure on plaintiff's part, and the evidence warranted the finding of the court that the "dairy building and said facilities for running the same should have been supplied long prior to the month of May, 1910. That the same were necessary and essential for the carrying out of said contract by the plaintiff upon his behalf, and said buildings and machinery should have been finished long prior to the month of May, 1910."

There was evidence justifying the court in finding that defendant failed and refused to furnish such new farming implements as were necessary for the proper conduct of the farm, "though often requested by plaintiff to buy said farming implements." So, also, was there evidence warranting the finding "that there was no place upon said farm where said cows could be properly taken care of; nor any place that could serve as a creamery to take care of said milk and cream the product of said cows." There was also evidence tending to show that defendant had not kept his agreement in the matter of furnishing lumber to repair the fences and to make the necessary new fences.

Plaintiff was asked, on cross-examination, why he quit on May 26th—"what happened on that day that caused you to quit the lease? A. Because I was entirely satisfied that he (defendant) won't put up what he promised me, because it

has been long enough he promise to do it, telling me going to do it, and he never did—I told him lots of times and he never did.''

We think the findings of fact necessary to support the judgment are sufficiently justified by the evidence. After so long and unnecessary delay in providing plaintiff with the facilities for properly carrying on the enterprise, he was not bound to remain even though, at the time he quit, defendant was manifesting a willingness to do the things he had agreed to do. It was for the court to decide from all the facts whether defendant had acted with reasonable promptness in keeping his covenants and whether, under all the circumstances, plaintiff was justified in abondoning the contract.

2. It is contended that the court erred in not awarding defendant liquidated damages as provided for in the contract by which plaintiff agreed ''that if from any cause it becomes impossible for him to continue to fulfill his covenants hereunder he will pay to said first party the sum of $2,000.00 as liquidated damages.'' It cannot for a moment be supposed that where the impossibility of performance by plaintiff was created by defendant himself he was to be paid this sum. The covenant was ''to insure the faithful performance'' of the contract by plaintiff, but if his failure was due to defendant's default, as the court found, plaintiff would be relieved from this particular obligation.

3. When plaintiff was testifying he was asked to state the amount of money he had expended in running the farm and the amount received from the proceeds of the farm. It appeared that he could not answer without referring to his memorandum book and bills which he had with him. Counsel for defendant objected to the witness using the book to refresh his memory, claiming that the book itself was the best evidence, and counsel also asked leave to examine the witness as to this book and its entries before he should be permitted to refresh his memory from it or read from it. ''The Court: Mr. Souza, did you make these entries in this book when the facts stated were fresh in your memory, when you remembered them clearly and distinctly, or did you write them after it happened? A. Why sure, I figure them all up when I get the bills. Q. You made these entries when you got the bills? A. Yes, every day I used to mark it down.'' It appeared

that this book showed all his receipts and expenses and from it he was able to arrive at the exact amount expended and the amount received, which showed that his expenses amounted to $1,636.39 and his receipts amounted to $841.29. The court ruled that counsel for defendant was not entitled to examine the witness before being permitted to refer to this memorandum book, nor were they entitled to examine the book. The court remarked: "I think the rights of defendant will be protected on cross-examination." This book was not offered in evidence and the use made of it was to refresh the memory of the witness. It was shown, in reply to questions put by the court, that the entries were written by plaintiff—partly in the Portuguese language, "at the time when the fact occurred and when . . . fresh in his memory," but in such case, section 2047 of the Code of Civil Procedure, required that "the writing must be produced, and may be seen by the adverse party, who may, if he choose, cross-examine the witness upon it." The purpose of these provisions is to give every opportunity to the adverse party to test the important fact that the writing conformed to the requirements of section 2047. It was error to deprive the adverse party of the right thus given, but as defendant had full opportunity to examine the memorandum book and to cross-examine the witness on the matter and availed himself of such opportunity, the error was not prejudicial. Nor did the cross-examination disclose facts which would have justified the court in granting defendant's motion to strike out all of plaintiff's testimony on the point.

4. On cross-examination plaintiff was asked if a proposition was not made to him to treat defendant's hay that was in the barn as plaintiff's hay and stack a like amount outside for defendant. The court sustained an objection to the question. We cannot see that the question was material. There was no evidence or offer to show that the hay was of equal value ton for ton, nor that plaintiff agreed to any such exchange. He was under no obligation to accept such offer.

5. Some questions were asked the plaintiff on cross-examination about his experience in running a dairy in Yreka, to which plaintiff objected as irrevelant and immaterial. We cannot say that the court erred in sustaining the objection.

6. Plaintiff was asked, on cross-examination, some questions as to what was said at the time the contract was being prepared. One question was—"Did you insist at that time on having a barn with stanchions for your cows constructed at once"? The court sustained plaintiff's objection to the question. Defendant claims that, inasmuch as the contract fixed no time within which the barn was to be finished, the question was a proper one. Had plaintiff answered, either yes or no, it would not have helped defendant's case in the slightest degree, and hence there was no prejudice in the ruling. The point urged as ground for error would have arisen had the witness been asked to state the conversation, if there was any, as to the time to be given for erecting the barn.

7. There was no error in limiting the number of questions put to plaintiff on cross-examination as to his knowledge of the cost of the barn. He had said he did not know what the cost would be. It was not claimed by defendant that the delay in building the barn arose from any difference of opinion between the parties as to the cost.

8. Some complaint is made of the rulings of the court in allowing plaintiff to testify to the quantity of hay the farm would produce on the ground that his competency had not been shown. Plaintiff's experience as a farmer sufficiently appeared. The court remarked: "I think it would be a matter of observation and would go more to the weight of his testimony than to its admissibility—he is giving what he thinks." We discover no error in the ruling.

9. On cross-examination plaintiff was asked to state what the $841.24 of receipts from produce included. An objection was sustained on the ground that it had been "all gone over" and was beyond the limit given in allowing the cross-examination to be reopened. Defendant had previously examined the witness concerning his statement of receipts and expenses and had access to the bills and memorandum book. It was within the discretion of the court to refuse a re-examination of matters once fully gone into.

Our attention is called to numerous errors assigned in the specifications, but as appellant makes no further mention of them in his brief we do not feel called upon to give them further notice.

Appellant makes no objection to the items entering into the damages awarded plaintiff by the court. They consisted of the difference between the receipts and expenses of the farm, of the value of plaintiff's time, and the expense incurred in moving his family to the farm.

The reversal of the judgment is asked on the ground that the evidence fails to show defendant's breach of the contract as found by the court. It may be that all the findings of fact are not fully supported, but we think there was evidence quite sufficient to justify enough of the findings to support the judgment.

The judgment and order are, therefore, affirmed.

Hart, J., and Burnett, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on August 1, 1913.