[Civ. No. 218. Fifth Dist. May 8, 1964.]

EMILY JANE VOGELSANG, as Executrix, etc., et al., Plaintiffs and Respondents, v. EUGENE B. WOLPERT et al., Defendants and Appellants.

Stammer, McKnight & Barnum, Stammer, McKnight, Barnum, Bailey & Barnett, Galen McKnight, Lerrigo, Thuesen & Thompson and Frank Lerrigo for Defendants and Appellants.

Barrett, Wagner & Dietrich and James F. Wagner for Plaintiffs and Respondents.

CONLEY, P. J.—The Vogelsangs obtained a judgment against Eugene B. Wolpert and his family corporation, Oxford Investment Company, for $55,806.10, $12,250.84 interest, and $5,000 punitive damages in a fraud action involving the transfer by the Vogelsangs to the defendants of virtually all of their extensive real and personal property.

The trial court found that the plaintiffs were induced to turn over to defendants for an allegedly grossly inadequate consideration their property, consisting of 360 acres of improved farm land near Laton, a dairy herd of 259 cows besides bulls and calves, a complete dairy, farm machinery and

equipment, including two pick-up trucks, four tractors, a 2,200-gallon bulk milk tank, a hay bailer, a hay chopper, four wagons and trailers, hay moving equipment, and other items, a grade A milk producers contract with Knudsen Creamery Company, approximately 1,200 tons of silage, repair and shop tools, together with agricultural parts and farm supplies, irrigation pipe lines and sprinkling equipment, and irrigation accessories sufficient to water plaintiffs' real properties, the sum of $14,950 in cash payable to some of plaintiffs at Visalia Branch of Security Title Insurance Company, from the sale of real property, an 80-acre cotton allotment pertaining to plaintiffs' real properties, other miscellaneous personal properties necessary to conduct a dairy and farming business, and the equity in a house and lot with furnishings and equipment at Pismo Beach in San Luis Obispo County. The court further expressly found that these transfers were induced by "false, fraudulent, and deceitful acts, promises and misrepresentations of defendants," and that each "promise and misrepresentation of defendants set forth ... constitutes acts, promises and misrepresentations of material facts by said defendants," that such promises were made without any intention to perform on the part of defendants but solely to induce plaintiffs to transfer their properties to defendants, that all of the misrepresentations were known by the defendants to be false and fraudulent, that the defendants intended that plaintiffs should rely and act upon these deceitful and untrue representations, that plaintiffs did so rely, and that plaintiffs sustained actual damages. The trial court was of the opinion that ". . . the alleged fraud although shrouded in an apparent veil of strict legality was gross."

The transfer of the property was effected through the Title Insurance and Trust Company at Visalia on January 9, 1958, when the plaintiffs signed written escrow instructions; thereafter, they executed deeds and bills of sale for all of their land, farm machinery and dairy equipment, 259 head of cows and all bulls and calves, and on January 15, 1958, the defendants took possession of the ranch. The defendants paid nothing in hand to plaintiffs for the transfer of the properties; they assumed existing encumbrances and, according to the findings, agreed also to pay other business debts of plaintiffs; they never in fact paid these additional sums.

The plaintiffs also signed at a somewhat later date but as part of the transaction, an agreement dated February 10, 1958, prepared by William B. Mitchell, an attorney at law

and an officer and director of defendant, Oxford Investment Company. This document provided that Oxford Investment Company ". . . will offer for sale the said 360 acres of land . . . known as the Laton Ranch . . . and that any sale thereof shall be at such price and on such terms as shall be determined solely . . ." by the Oxford Investment Company. The agreement further stated that ". . . from the proceeds of any such sale" the Vogelsangs "shall receive twenty per cent (20%) of that portion of the net sales price which exceeds the sum of One Hundred Eighty Thousand and No/100 Dollars ($180,000.00)."

The defendants did not sell the property, claiming at the trial that the obligation was entirely discretionary with the Oxford Investment Company, that it expired in one year, and that the defendants had purchased the real and personal property for the amount of the encumbrances.

### The Trial Court's Finding of Fraud Cannot Be Disturbed.

Numerous points are raised on the appeal involving the pleadings, the findings, and the evidence, and these contentions will be considered in due course, but the principal question to be determined is whether the record contains any substantial evidence to support the conclusion of the trial court that the fraud of the defendants was proven.

Wilful fraud, to borrow a figure from classical antiquity, is a hydra-headed monster; its faces are various; they may differ one from another as markedly as personal and business relationships are unlike in the modern world, but all of them have this in common that wilful fraud is always instinct with guile. By false representations, knowingly made, the beneficiary of actual fraud has wilfully induced another to part with his property without adequate compensation; he has been guilty of overreaching, of dishonest gain by misleading another, of obtaining property under circumstances which are unfair and unconscionable and which the law will not tolerate.

In 37 Corpus Juris Secundum, Fraud, section 1, pages 204-205, it is said: "Fraud is a generic term which embraces all the multifarious means which human ingenuity can devise and are resorted to by one individual to gain an advantage over another by false suggestions or by suppression of the truth. In its general or generic sense, it comprises all acts, omissions, and concealments involving a breach of legal or equitable duty and resulting in damage to another, or the

taking of undue or unconscientious advantage of another;
. . .

"Fraud has also been defined as any cunning, deception, or artifice used to circumvent, cheat, or deceive another."

Our own Civil Code gives appropriate definitions of fraud and deceit:

"ACTUAL FRAUD, WHAT. Actual fraud, within the meaning of this Chapter, consists in any of the following acts, committed by a party to the contract, or with his connivance, with intent to deceive another party thereto, or to induce him to enter into the contract:

"1. The suggestion, as a fact, of that which is not true, by one who does not believe it to be true;

"2. The positive assertion, in a manner not warranted by the information of the person making it, of that which is not true, though he believes it to be true;

"3. The suppression of that which is true, by one having knowledge or belief of the fact;

"4. A promise made without any intention of performing it; or,

"5. Any other act fitted to deceive." (Civ. Code, § 1572.)

"FRAUDULENT DECEIT. One who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers." (Civ. Code, § 1709.) Section 1710 of the Civil Code reads:

"DECEIT, WHAT. A deceit, within the meaning of the last section, is either:

"1. The suggestion, as a fact, of that which is not true, by one who does not believe it to be true;

"2. The assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true;

"3. The suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact; or,

"4. A promise, made without any intention of performing it."

As is said in *Zinn* v. *Ex-Cell-O Corp.*, 148 Cal.App.2d 56, 68 [306 P.2d 1017]: "The general elements of a cause of action for fraudulent misrepresentation are (1) misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity (scienter); (3) intent to induce reliance; (4) justifiable reliance; and (5) resulting damage. (See *Seeger* v. *Odell* (1941) 18 Cal.2d 409, 414 [115 P.2d

977, 136 A.L.R. 1291]; Rest., Torts, § 525 et seq.)'' (See also *Anderson* v. *Handley,* 149 Cal.App.2d 184, 186 [308 P.2d 368]; *Lawson* v. *Town & Country Shops, Inc.,* 159 Cal.App.2d 196, 200 [323 P.2d 843]; *Clar* v. *Board of Trade,* 164 Cal. App.2d 636, 644 [331 P.2d 89]; *M. G. Chamberlain & Co.* v. *Simpson,* 173 Cal.App.2d 263, 276 [343 P.2d 438].)

In *New* v. *New,* 148 Cal.App.2d 372, 383 [306 P.2d 987], the court aptly sets forth the rules which must control our examination of the record: ''The appellate court must accept as established all facts and all inferences favorable to respondent which find substantial support in the evidence.

'And where appellant urges the insufficiency of the evidence to sustain the findings ... the rule is that, ''Such contention *requires defendants to demonstrate* that there is no substantial evidence to support the challenged findings.'' *(Nichols* v. *Mitchell,* 32 Cal.2d 598, 600 [197 P.2d 550].) (Italics added.) It is said in *Crawford* v. *Southern Pac. Co.,* 3 Cal.2d 427, 429 [45 P.2d 183], that: ''It is an elementary, but often overlooked principle of law, that when a verdict is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury. When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court.''' *(Hartzell* v. *Myall,* 115 Cal.App.2d 670, 673 [252 P.2d 676].)'' (See also *Ashburn* v. *Miller,* 161 Cal.App.2d 71, 74 [326 P.2d 229].)

Because of the diversity of factors and the differing intelligence of those guilty of fraud and their victims, the function of the trial judge in fraud cases is particularly significant. It is the duty of the judicial officer who sees and hears the witnesses to determine the weight and effect of their evidence; if there is any substantial showing of fraud the trial court must determine whether it outweighs the testimony presented by the opposing side; and his decision is ordinarily final in matters of this kind; appellate courts will not disturb a finding of fraud if there is any substantial evidence to support the lower court's decision. *(Bank of America* v. *Sanchez,* 3 Cal.App.2d 238, 242 [38 P.2d 787]; *Pores* v. *Purity Milk Co.,* 135 Cal.App.2d 305, 307-309 [287 P.2d 169]; *Davis* v. *Butler,* 154 Cal. 623, 626 [98 P. 1047]; *Binning* v. *Binning,* 210 Cal.App.2d 693 [27 Cal.Rptr. 187].)

As a determination of the existence of fraud is particularly within the decisional field of the trial judge, the appellants are attempting to swim upstream against a strong current of authority when they maintain that there was no such showing in the long record, and in effect that this court should pass again upon the factors which the trial court found to be indicative of fraud.

When a plaintiff alleges more than one instance of fraudulent conduct, he is not required to establish the character of every such representation; proof of a single material instance of fraud is sufficient to justify a judgment in favor of the defrauded person, if other necessary factors are present. (*Cross* v. *Bouck*, 175 Cal. 253, 257 [165 P. 702]; *Feckenscher* v. *Gamble*, 12 Cal.2d 482, 492 [85 P.2d 885].)

Fraud, of course, may be proved by inference and by the circumstances surrounding the transaction and the relationship and interests of the parties. (*Dyke* v. *Zaiser*, 80 Cal.App.2d 639, 654 [182 P.2d 344]; *Jorgensen* v. *Jorgensen*, 32 Cal.2d 13, 18-21 [193 P.2d 728].) In *Dandini* v. *Dandini*, 120 Cal.App.2d 211, 214 [260 P.2d 1033], it is said: "Fraud and conspiracy are not generally practiced in the open light of day and for that reason are not ordinarily susceptible of direct proof but must be spelled out from circumstantial evidence. 'In cases of conspiracy to defraud it is not to be expected that direct evidence of the conspiracy can be secured, because such evidence could usually only be secured in the event one of the conspirators confessed. The jury may infer the conspiracy from all the circumstances, and if the inference is a reasonable one it will not be disturbed on appeal.' "

A statement of opinion must be honestly entertained by the person making it and whether or not a representation is one of fact rather than a matter of opinion depends largely on the circumstances (*White* v. *Financial Guarantee Corp.*, 13 Cal.App.2d 93, 97 [56 P.2d 550]).

As compared with concepts in certain other legal fields, fraud is not the subject of a strictly objective test. What would constitute fraud in a given instance might not be fraudulent when exercised toward another person. As is observed in *Feckenscher* v. *Gamble, supra,* 12 Cal.2d 482, 496-497: " 'That plaintiff is too credulous is not generally a defense. "The test of the representation is its actual effect on the particular mind, whether it is a strong and

circumspect mind, or one weak and too relying." ' (*Neff* v. *Engler,* 205 Cal. 484, 489 [271 P. 744].) ''

At this stage, a short review of the facts is essential. Otto Vogelsang, died on February 5, 1959; his daughter, Emily Jane Vogelsang, as his executrix, is one of the parties plaintiff; other plaintiffs are Otto's widow, Erma, their son, Clarence, and Clarence's wife, Alma. Clarence had a high school education; his wife was born and reared in Poland; she went to grammar school and at the time of trial had been in this country for only 11 years. On the other hand, Eugene Wolpert had attended the University of Southern California; he was a successful and extensive operator of land and cattle, and owned and controlled the family corporation, Oxford Investment Company, with his brother, William B. Wolpert. The officers and directors were Eugene B. Wolpert, president, William B. Mitchell, vice-president, and William B. Wolpert, secretary-treasurer.

The Vogelsangs purchased two ranches in 1956, one, the Maddox Place contained 250 acres, a second, the Butts Place, 112 acres, for $190,000 and combined them to form the Laton Ranch. They made extensive improvements including the laying of 4,500 feet of concrete irrigation pipe, the installation of a grade A Dairy Barn with an 8-cow "walk-through parlor," a holding corral, and four corrals each of which had watering troughs for 100 cows, and dairy equipment including a 2,200-gallon milk tank, milking machines with glass pipelines and necessary vacuum machines and pulsators.

In the fiscal year ending March 31, 1957, the plaintiffs had a net income of $34,975.68 from their farming operations, but in 1958 they developed financial difficulties principally through lack of operating capital and could not pay current debts. The annual sum due on the trust deed to Maddox, the former owner of the 250-acre ranch, was in default and a payment on the Butts Place would soon be due; outstanding obligations to other creditors amounted to about $50,000; under the pressure of circumstances, Clarence had sold some cows and calves from the herd without accounting to the mortgagee.

Plaintiffs attempted to sell the dairy ranch and gave a written exclusive real estate listing to a Visalia broker named Van S. Hughes. Hughes met Wolpert and Wolpert made inquiries about the ranch. He stated that he would investigate the bills owed by the Vogelsangs; he met with Clarence and his father numerous times. Wolpert finally said that he was

not interested in buying the ranch but would make a proposition that would result in a profit for his own company and would also help the Vogelsang family.

Mr. Wolpert suggested that the Vogelsangs transfer all of their holdings to his company without the necessity of paying anything down; he emphasized that he would put the property in shape so that it could be sold at a profit; the Vogelsangs would then receive 20 per cent of all monies received in excess of $180,000; he strongly represented that he would improve the condition of the ranch by cleaning it up and increasing production, and that he would be able to arrange a later sale for more profit than the plaintiffs could otherwise possibly make.

At the trial Clarence Vogelsang testified that the reason Wolpert insisted that the Vogelsangs turn over to him the Iskendarian cash, which, as stipulated at the trial, amounted to $14,951.98 from another pending sale, was to take care of the costs that would have to be expended to get the ranch in shape for sale. Defendants were to repay the Iskendarian proceeds plus the $5,000 cash equity in the Pismo Beach summer home less certain expenses in one year, whether or not the ranch had been sold. Respondents' brief states that the total sum to be repaid was $19,951.98, which was misstated by error in the agreement of February 10, 1958, as $17,915.79. In this connection, Mr. Mitchell testified the Vogelsangs were to get some ''nineteen and a half thousand dollars''; the contract mistakenly stated a smaller amount.

Before the Vogelsangs executed the documents transferring all of the properties to the defendants, they were vitally concerned for the safety of Clarence from criminal prosecution, because he had sold about 200 head of calves and cows for something over $17,000, but had not accounted for the proceeds to the mortgagee, California Cattle Security Company. Wolpert told Clarence that criminal charges would be filed against him by California Cattle Security unless the proposed sale was made, and that he had induced the mortgagee to refrain from criminal action if the Vogelsangs turned over the properties to the defendants.

On January 9, 1958, plaintiffs signed the escrow agreement at the Title Insurance and Trust Company office in Visalia, and shortly thereafter transferred legal title of all real and personal properties and plaintiffs' cash assets, to the Oxford Investment Company. Before the escrow was closed, Wolpert told the Vogelsangs that the real estate broker, Van S. Hughes,

would delay the sale if he were not paid his commission and induced them to execute a confession of judgment in favor of Hughes for $9,000.

Mr. Wolpert suggested that Attorney Mitchell prepare the written agreement mentioned in the escrow instructions and arranged a meeting with him on February 9, 1958. Mitchell prepared the contract dated February 10, 1958; it was thereupon signed by plaintiffs. Mitchell admitted, under cross-examination at the trial, that Clarence was worried about the threat of criminal prosecution, which Wolpert said the mortgagee of the cattle intended to initiate, that Wolpert said to Vogelsang: "You know that I have to get this loan straightened out with California Security Loan because of the position you are in," and that Clarence Vogelsang answered, "Yes, I know that." At that time, defendants did not disclose the fact that an agreement had already been entered into wherein defendants agreed to assume and to satisfy the balance due on the mortgage.

The basic agreement prepared by Mr. Mitchell is a document remarkable for its omissions, one of which is that it does not state with precision what would be the result of a failure to sell the property within one year. Appellants contend that it was a matter of choice with the Oxford Investment Company whether the land should be sold at all during the year, and that the profit from a sale after one year would belong wholly to the Wolpert interests, but the Vogelsangs say that it was understood that an honest attempt would be made to sell within one year, and that in the absence of such a sale they would still be entitled to share in the result at a later time. Mr. Mitchell admitted that there was no discussion between the parties as to what would happen if the defendant had not sold the ranch by the end of the year following transfer of title. At the trial, respondents' counsel asked Mr. Mitchell: "As an attorney, you knew, of course, there were many open ends in this agreement, didn't you?" and Mr. Mitchell answered: "There are some things that would require further agreement if the parties were to carry them into effect. Yes, Mr. Wagner."

Among other things, the contract was not at all clear as to whether the parties contemplated the inclusion of the increased herd of cattle in the sale. Mr. Wolpert contended at the trial that such sale would not cover the cattle, yet, the original transfer of title from Vogelsangs to Wolpert did in fact include the herd of cows, bulls, and calves which was then on the property. During succeeding years, Mr. Wolpert

did increase the herd and whether the larger herd was to be the subject of sale for the joint benefit of the parties was not made clear in the contract. This garbling of contractual provisions might well lead a trial court to the conclusion that it was the intention of Mr. Wolpert so to complicate things that the rights of the Vogelsangs would be in serious doubt with respect to a sale. Where the contract was specific, all rights, without exception, with respect to selling the property were given to the defendants; they were to judge without limitation whether an offered price was acceptable.

To speed the takeover, Wolpert caused to be prepared orders providing that two creditors who had filed attachments would be paid out of monies from the sale of the ranch; they were signed by Clarence Vogelsang and the creditors released their attachments so that appellants could take the properties free of the liens; the assignments were for $2,578.02 and $7,294.51. In addition, Mr. Mitchell, at the request of Wolpert, prepared an assignment of the sum of $25,000 signed by plaintiffs and payable to Ernest Vogelsang, brother of Clarence, out of the money which would become due to plaintiffs upon the sale of the ranch.

Did Wolpert honestly attempt to sell the ranch? He did not give a *written* listing to any broker; and the record shows that he refused an offer to sell a substantial part of the property at $1,000 an acre. The question was an open one as to whether he desired, or honestly acted to procure, a sale of the properties. Mr. J. A. Taylor, an employee of Wolpert on the dairy ranch, testified he had a conversation with Mr. Wolpert while riding in a car with him about raising fall calves from the heifers, and "then we got to talking about the Vogelsangs, so he came out and flatly told me he didn't aim to pay 'the sons-of-bitches' anything."

N. N. Sheklian, certified public accountant, who handled the Vogelsang books, gave testimony from which respondents' counsel calculated that their capital costs adjusted for depreciation to January 15, 1958, were $390,189.65 not including the value of the shop tools and silage and that the Vogelsangs' total capital equity amounted to $120,155.68.

In plaintiffs' complaint, there are ten specific allegations of fraud; the court found that nine of them were true, but over and above these specific allegations the essential fraud of the defendants was that for an inadequate consideration they obtained title to valuable real and personal property through a representation that the transaction was not in fact

a final purchase, but only a temporary arrangement to permit the defendants to sell the ranch for the joint benefit of the plaintiffs and the defendants. The plaintiffs were to receive 20 per cent of all sums over $180,000, in addition to the repayment of some $19,951.98 in cash, less certain expenses, which had been turned over by the plaintiffs to the defendants in connection with the deal. Plaintiffs maintain, and the court so found, that the defendants never at any time intended to sell the property for the joint benefit of the parties, but secretly treated the transaction as a final total sale by which they received title to all of the property both real and personal for their own exclusive benefit.

In their briefs, defendants repeat several times that the pleadings did not permit proof of anything but the specifications explicitly set forth in the complaint and that this would eliminate proof of overall fraud. The appellants are mistaken in this respect.

Turning to Count 1 of the complaint, we find the following allegation: "... that the said transfers, conveyances and assignments were induced by false, fraudulent and deceitful acts and misrepresentations of defendants; that the false, fraudulent and deceitful acts and misrepresentations of said defendants specifically include the following:" etc.

It can thus be seen that the complaint did not limit itself to the 10 specific allegations of fraud, but that it also covered by its terms a general statement of "false, fraudulent and deceitful acts and misrepresentations." Under "Contentions of the Parties" in the pretrial conference order we find the following: "... that on or about January 9, 1958, said plaintiffs were induced to transfer, convey and assign all of said real and personal property to the defendants EUGENE B. WOLPERT and OXFORD INVESTMENT COMPANY by certain false, fraudulent and deceitful acts and misrepresentations of said defendants, *as alleged in said complaint*; ..." (Italics added.)

The pleadings, the pretrial order and the findings properly enlarge the finding of fraud over and above the 10 specific statements of fraudulent representation.

The court made full and complete findings with respect to fraud stating generally: "... plaintiffs herein were induced to transfer, convey and assign all of their real and personal properties described in said Complaint to defendants EUGENE B. WOLPERT and OXFORD INVESTMENT COMPANY; that said transfers, conveyances and assignments were induced by false, fraudulent and deceitful acts, promises and misrepresentations of defendants, and each of them; that each

and every act, promise and misrepresentation of defendants set forth herein constitutes acts, promises and misrepresentations of material facts by said defendants; that each and all of said acts, promises and representations were false, fraudulent, deceitful and untrue when made by said defendants; that each and all of said acts, representations and promises made by defendants, and each of them, were made without any intention on the part of defendants, and each of them, of keeping said acts, representations, and promises, and were made to induce plaintiffs herein to turn over and transfer their real and personal properties herein described to defendants, and each of them; that each and all of said acts, promises and misrepresentations were known by said defendants, and each of them, to have been false, fraudulent, deceitful and untrue when made; that said defendants, and each of them intended that plaintiffs, and each of them, rely and act upon each and all of said false, fraudulent, deceitful and untrue acts and misrepresentations; that plaintiffs, and each of them, did in fact rely and act upon each and all of said false, fraudulent, deceitful and untrue acts and misrepresentations of said defendants; that plaintiffs, and each of them, have sustained actual damages proximately resulting from each and all of said false, fraudulent, deceitful and untrue acts, promises and misrepresentations of said defendants; ..."

The following conclusions from the evidence could have been reached legitimately by the trier of fact, if, as he had a right to do, he accepted the testimony of plaintiffs' witnesses and rejected that of defendants: by taking unconscionable advantage of plaintiffs' condition and necessities and for a grossly inadequate consideration (*Odell* v. *Cox*, 151 Cal. 70 [90 P. 194]; 3 Pomeroy's Equity Jurisprudence, § 927, pp. 634-637), defendants took over all of the property of plaintiffs, including several thousands of dollars in cash, when they were apparently hypnotized by Wolpert's superior intelligence and "know-how," upon his promise that he was working for their joint benefit, and that he would greatly improve the property and sell it for their mutual advantage; that he did not keep his word or observe, in practice, his glowing representations, and that actually, to use what a witness said were his own words, he never intended "to pay 'the sons-of-bitches' anything." (See: *Mary Pickford Co.* v. *Bayly Bros., Inc.,* 12 Cal.2d 501, 510-511 [86 P.2d 102]; *Hawthorne* v. *Farrell,* 193 Cal.App.2d 530, 534 [14 Cal.Rptr. 423]; *Ponti* v. *Farrell,* 194 Cal.App.2d 676, 682 [15 Cal.Rptr.

500]; *Berkey* v. *Halm,* 101 Cal.App.2d 62, 69 [224 P.2d 885].)

The court also made complete findings with respect to the nine separate and distinct claims of fraud, many of which separate allegations are supportive of the general finding of fraud, above quoted: "... that the false, fraudulent and deceitful acts, promises and misrepresentations of said defendants Eugene B. Wolpert and Oxford Investment Company are as follows: (1) that defendant Eugene B. Wolpert (or defendant Oxford Investment Company, as a corporate entity owned and controlled by defendant Eugene B. Wolpert) would take over the operation, management and control of the dairy and general farming business for the use and benefit of plaintiffs, (2) that the said defendants would assume and agree to pay certain business and personal debts and obligations of plaintiffs as set forth in those written escrow instructions directed to Title Insurance and Trust Company, executed by both plaintiffs and defendants herein, dated January 9, 1958, referred to in that certain written agreement between plaintiffs and defendants dated February 10, 1958, and also certain other business debts, to-wit, the Pardue Hay bill, the Kings County Cement Pipe Company bill, the Central Valley Cooperative feed bill, the Hanford Farm Supply bill, Hunt's feed bill, and Cal's Dairy Supply bill, (3) that said defendants would 'build up' the said dairy and general farming business in order that a 'favorable' sale of the said real and personal properties could be made at a future time, (4) that defendants would subsequently negotiate a sale of said real and personal properties, as a going concern, and plaintiffs would share in the said proceeds of sale in a sum equal to twenty percent (20%) of the excess of said sales price over the sum of $180,000.00, and that defendants would also repay to plaintiffs the sum of $14,950.00, in cash, previously advanced and paid over to defendants by plaintiffs, and that defendants would also pay to plaintiffs $5,000.00, in cash, constituting the agreed equity in the Pismo Beach residential property previously owned by plaintiffs and conveyed to defendants, (5) that if plaintiffs would convey, transfer and assign their said real and personal properties to defendants, as herein set forth, defendants would negotiate a later sale of the said real and personal properties for a much greater profit than plaintiffs would otherwise realize because of defendant's superior business accumen and connections, (6) that defendant Eugene B. Wolpert, being personally acquainted with the officials of Knudsen Creamery Company, would use his per-

sonal influence with said creamery company to sell plaintiff's milk contract along with the dairy cattle, at a substantially larger price than would otherwise be obtainable for the dairy cattle and milk contract as separate assets, (7) that plaintiffs could not possibly make a profitable sale of the said real and personal properties, including the 'grade A' milk contract, unless plaintiffs first transferred, conveyed, and assigned the said real and personal properties to defendants, since plaintiffs were in financial distress and were not presently then considered good business risks while defendants, and each of them, enjoyed excellent business reputations, and could obtain credit and other financing for the said real and personal properties that plaintiffs could not hope to obtain, (8) that California Cattle Security Company, Limited, as mortgagee of plaintiffs' dairy herd, intended to bring criminal charges against plaintiffs for selling mortgaged cattle and for failing to pay the proceeds of sale to the said mortgagee corporations, and (9) that if plaintiffs would convey, transfer and assign all of their said real and personal properties, as hereinabove set forth, defendants would prevail upon the corporate mortgagee not to bring the aforesaid criminal charges against plaintiffs.''

There is ample evidence to support these findings; Clarence Vogelsang testified that he did not recall that Mr. Wolpert ever said that he would buy the property: ''It was always that we would sign it over to him and that he would expand it and that we would all see a profit out of it, us and him.''

He was asked by his attorney: ''Was the event ever discussed of what would happen if the ranch was never resold?'' and the plaintiff answered, ''No.''

He was again asked the question: ''Was there anything ever said about who would keep the ranch if it wasn't resold within a year?'' and the answer given was ''No.'' The appellant, Wolpert, testified: ''I told Mr. Vogelsang that I really wasn't interested in buying the ranch, but I would make a proposition, if it was feasible to make a profit for my own company, and also to help the Vogelsang family out, ...''

The testimony was conflicting with respect to the question of whether Wolpert ever promised to pay the Pardue Hay bill of $7,294.15, the Kings County Cement Company bill of $3,670.82, the Central Valley Co-op Feed bill of $3,289.04, the Hanford Farm Supply bill of $971.94, the $2,000 Hunt's Feed bill, and the Cal-Dairy Supply bill of $1,437.40. Mr.

Wolpert said that he had not promised to pay these additional amounts and Mr. Vogelsang said that he did make such promises prior to the execution of the contract. Mr. Vogelsang testified: "... after I had given him the list of bills that he wanted, he told me that he would assume these accounts that I had read off and that in the process of talking to him, I don't know that I ever said too much in answer, ..."

The trial court had positive testimony by Mr. Vogelsang that would justify a finding in accordance with the court's conclusion.

Mr. Vogelsang testified that Mr. Wolpert had told him that he could sell the ranch and that he would build up the herd; he also testified: "[Mr. Wolpert] said ... that if we signed over the deeds and title, that he would take the property and re-sell it in a year's time, that we would see profit out of it. ... That he would build the thing up bigger and better than it was, that it would be easier to sell"; Mr. Wolpert allegedly stated that with a larger butterfat contract the sale would be simpler, and that he could get a bigger butterfat contract.

The defendant admitted that he did say to the plaintiffs that if they "... would convey, transfer and assign their said real and personal properties to defendants, ... defendants would be able to negotiate a later sale of said real and personal properties for a much greater profit than plaintiffs would otherwise receive." And that "money would have to be spent, and at that time the Vogelsangs were in no position to do it."

Mr. Vogelsang testified, "Mr. Wolpert told me that the DeLongs had talked to him, and he had threatened to go to the District Attorney, and he told me if this deal wouldn't go through, they would probably prosecute and that he had talked them into holding off until everything could be signed over to him."

The court further found: "... defendants EUGENE B. WOLPERT and OXFORD INVESTMENT COMPANY deliberately took advantage of and preyed upon the plaintiffs' lack of business experience and education herein; that defendants deliberately and with malice frightened and terrified the plaintiffs with the threat of possible criminal prosecution for selling mortgaged cattle without paying the proceeds thereof to the mortgagee, using this threat as a means of inducing the said plaintiffs to turn over the said real and personal properties to defendants; that said defendants, at the time of the transfer to defendants of said real and personal

properties, and on or about January 9, 1958, did not pay money or other things of value to plaintiffs, but simply refinanced the real and personal properties belonging to said plaintiffs, which had a fair market value in excess of the then existing liens and encumbrances; that the said real and personal properties constitute a going business that has been profitable to said defendants EUGENE B. WOLPERT and OX-FORD INVESTMENT COMPANY; that said defendants have kept and retained the profits since the date of their acquisition of the said real and personal properties and have never paid any money to plaintiffs herein or fulfilled the representations and promises made to plaintiffs, as hereinabove set forth; that the said written escrow instructions hereinabove mentioned and the said written agreement dated February 10, 1958, hereinabove mentioned were each prepared at the direction and request of defendants EUGENE B. WOLPERT and OXFORD INVESTMENT COMPANY; that the execution of said documents by plaintiffs, and the further instruments of transfer and sale including the bills of sale and deeds to real property, were procured through the fraud, deceit and misrepresentations of the defendants EUGENE B. WOLPERT and OXFORD INVESTMENT COMPANY, and each of them; that plaintiffs were not represented by any attorney in these transactions, the subject of this action, while defendants were represented by an attorney, who also was an officer in said defendant corporation, OXFORD INVESTMENT COMPANY; that defendants, and each of them deliberately and intentionally did not explain to the plaintiffs the terms and conditions of said written agreements hereinabove mentioned and referred to, and plaintiffs at the time of execution and delivery thereof did not understand the content and meaning thereof; that after obtaining possession of the said real and personal properties, the defendants, and each of them, have continuously operated and managed the said real and personal properties for their own use and benefit, without any intention of performing any of the promises and commitments on their part to be kept and performed; that the defendants, and each of them did not at any time in good faith attempt to sell the said real and personal properties, or any or part of them, and by subterfuge, delay and duress concealed the aforesaid facts from the plaintiffs; that the said defendants did not pay the federal tax lien against the said real properties as required by the provisions of the said escrow instructions dated January 9, 1958; and that the said acts and conduct of said defendants, and each

of them, constituted a scheme to cheat and to defraud plaintiffs, and to deprive plaintiffs of their said real and personal properties.''

It is our considered conclusion that the trial court was justified in finding fraud. All of the necessary elements were present; this court cannot interfere with the findings of the trial court in view of the support given them by the record.

### EVIDENCE OF THE INSTANCES OF ALLEGED FRAUD WAS PROPERLY ADMITTED.

Among the contentions made by the appellants, is that ''If defendants were guilty of any of the alleged fraudulent misrepresentations alleged in the complaint or found by the trial court, those misrepresentations occurred during the negotiations between Mr. Wolpert and Mr. Vogelsang prior to the preparation and signing of the escrow instructions. It is claimed that the misrepresentations induced the agreement and there is no claim or evidence that any such misrepresentations occurred at any subsequent time.'' The appellants further observe that ''... in practically every instance the 'misrepresentations' relied upon were not false statements of fact separate from and independent of the final agreement but were promises allegedly made during the negotiations leading up to that agreement concerning matters covered in the agreement.''

To start with, the statement of the legal principle made by appellants is entirely too broad. ■■■ If there has been fraud in obtaining an instrument, it may always be shown by parol. It was never intended that the parol evidence rule should be used as a shield to prevent the proof of fraud, and there is no such sanctity in a writing that a defrauded party cannot show that fraud was practiced in its procurement. Statutory provisions that when an agreement has been reduced to writing the instrument is deemed to set forth all of its terms (Code Civ. Proc., § 1856) and that the execution of a contract supersedes prior negotiations (Civ. Code, § 1625) will never prevent proof of fraud. (*Ferguson* v. *Koch,* 204 Cal. 342 [268 P. 342, 58 A.L.R. 1176]; *Willey* v. *Clements,* 146 Cal. 91 [79 P. 850]; *Wholesalers Board of Adjusters* v. *Norton,* 13 Cal.App.2d 663 [57 P.2d 552]; *Hunt* v. *L.M. Field, Inc.,* 202 Cal. 701 [262 P. 730].)

However, appellants actually refer to a very much restricted principle, namely, that if and when a subsequent written agreement contains provisions which expressly contradict or

vary the terms of a precedent oral agreement, the parol evidence rule may regulate the situation. (*Bank of America* v. *Lamb Finance Co.*, 179 Cal.App.2d 498, 502 [3 Cal.Rptr. 877]; *Cobbs* v. *Cobbs*, 53 Cal.App.2d 780, 783-784 [128 P.2d 373]; *Newmark* v. *H & H Products Mfg. Co.*, 128 Cal.App. 2d 35, 37-38 [274 P.2d 702].) For example, if a contract in writing expressly provides for the payment of $1,000 for specified land, it would not be possible for an allegedly aggrieved plaintiff to sue for fraud on the ground that prior to the execution of the writing there was a fraudulent promise to pay $2,000. However, the situation presented by the record is not the one here illustrated. Referring to the nine specific grounds of fraud found by the trial court, the contract or the escrow instructions have nothing in them which would specifically conflict with the false and fraudulent representations that defendants would hold title of the property "for the use and benefit of the plaintiffs," that defendants would pay the additional debts of plaintiffs alleged by them, that defendants would negotiate a later sale of the properties for greater profit to all parties than plaintiffs could realize, that Mr. Wolpert could sell the milk contract and the cattle at a greater price than would be obtainable for the contract and the cattle as separate assets, that plaintiffs could not make a profitable sale of the properties, or that California Cattle Security Company intended to bring criminal charges against Clarence Vogelsang.

### THE DEFENSES OF WAIVER AND ESTOPPEL WERE NOT SUSTAINED.

In their fifth and sixth affirmative defenses, the defendants aver that plaintiffs waived their claims of fraud and were estopped by their agreements and conduct from making such claims. These contentions are founded on the theory that plaintiffs must have found out about the fraud at some unascertained time shortly after the escrow instructions and the contract were executed, and that, because they did not make an earlier claim, they waived their right to do so and were estopped from urging that ground as a basis of recovery. This contention is founded on two elements: first, the failure to complain for a period of several months, and, second, the impact of certain authorities of which *Schmidt* v. *Mesmer*, 116 Cal. 267 [48 P. 54] is an early example. In answer to the first claim, it is by no means certain that the plaintiffs had knowledge of the fraud until shortly before the

commencement of the present action. In the face of the findings, we cannot assume, as appellants seem to do, that the alleged fraud was discovered by the plaintiffs at a much earlier time. The case of *Schmidt* v. *Mesmer, supra,* 116 Cal. 267, and succeeding authorities stand for the general proposition that after discovery of a fraud which might otherwise vitiate a contract, the defrauded party may nevertheless waive his rights and breathe life into the agreement by intentionally recognizing its binding effect; such an intention may, in part at least, be evidenced by a request for a modification of the contract favorable to himself. There is no such situation in the present case, and the two special defenses are without merit.

### Appellants Fail To Distinguish Between An Assignment of Monies Due On A Contract and Damages for Fraud.

Appellants next complain that the persons to whom an assignment was made and to whom monies would have become due if the contract had been performed were not made parties to the lawsuit and that the judgment does not award damages directly to Ernest Vogelsang, G. M. Pardue, and William H. Hunt. In this connection, appellants fail to differentiate between monies due as a result of the performance of a contract and monies due as damages for fraud. Ernest Vogelsang and the Messrs. Pardue and Hunt had no right to any part of the damages as such awarded plaintiffs in this action. If the contract had been performed and suit in contract had been filed thereafter, it is quite true that the named assignees should have been made parties, but this is not the situation here, and the point is not well taken.

### The Findings on Damages Are Adequate.

The appellants complain with respect to the damages awarded to the plaintiffs. In the complaint, the plaintiffs allege that the properties transferred to the defendants had a reasonable market value of $553,230.29. But the court found that the reasonable market value of these properties was $397,400, and that the damages suffered by plaintiffs amounted to $55,806.10, that being the difference between the actual value of the real and personal properties with which they parted and the actual value of that which they received, taking into account also the items contained in the reconciliation of accounts. In addition, the court awarded interest in the sum of $12,250.84, making the total compensatory damages $68,056.94. There was also an award of $5,000 as puni-

tive damages. Appellants apparently maintain that the damages, if any, should have been $397,400, or $148,325.

It will be observed that the appellants apparently complain at this point that the respondents were awarded a smaller amount of damages than the findings would have warranted. Such a contention cannot be made for it is contrary to the elementary rule that "... the appellate court need not and will not review errors which could not have been prejudicial to [appellant]." (3 Witkin, Cal. Procedure, Appeal, § 71, p. 2227.) If the court should have granted more damages, that is something the respondents might complain of, by appeal, but they do not. It is true that the trial court observed in the record "The Court must concede that the amount of damages awarded the plaintiffs in its opinion, was conservative and minimum. . . ."

The contention that the court should have made more specific findings with respect to damages is oblivious of the rule that it is the trial court's duty to make findings as to ultimate facts and not as to evidentiary facts. A trial court is not required to assess damages separately for each item of loss; it must find the ultimate facts and not the probative facts. (*Elsbach* v. *Mulligan*, 58 Cal.App.2d 354, 366 [136 P.2d 651]; *Foster* v. *Keating*, 120 Cal.App.2d 435, 453 [261 P.2d 529]; *Broadway Fed. etc. Loan Assn.* v. *Howard*, 133 Cal.App.2d 382, 396 [285 P.2d 61].) The general principle should also be kept in mind that when it is contended that damages awarded are excessive the appellate court must determine every conflict in respondents' favor and give them the benefit of all legitimate inferences (*Seffert* v. *Los Angeles Transit Lines*, 56 Cal.2d 498 [15 Cal.Rptr. 161, 364 P.2d 337]).

There is finally a contention that it was improper to award interest and also punitive damages. It is, of course, well settled that interest may be awarded in a fraud action under Civil Code, section 3288, in the discretion of the trier of fact (*Nathanson* v. *Murphy*, 147 Cal.App.2d 462 [305 P.2d 710]; *Katz* v. *Enos*, 68 Cal.App.2d 266, 278 [156 P.2d 461]; *Deaux* v. *Trinidad Bean & Elevator Co.*, 8 Cal.App.2d 149, 152 [47 P.2d 535]; *Perry* v. *Magneson*, 207 Cal. 617 [279 P. 650]), and it is also clear that such interest and exemplary damages are not mutually exclusive; both may properly be awarded in the same case. (*Taylor* v. *Wright*, 69 Cal.App.2d 371, 384-386 [159 P.2d 980]; 2 Witkin, Summary of Cal. Law, Torts, § 406, p. 1610.)

126

THE EVIDENCE OF THE PURCHASE OF THE RANCH BY VOGEL-
SANGS AND THEIR IMPROVEMENTS WAS NOT ERRONEOUS.

 The court permitted proof by plaintiffs of the make-
up of the ranch and what was paid for it upon its acquisition
some two years before the deal with Wolpert, and also what
additions were made to the property by the plaintiffs with
the cost of the improvements. This evidence was obviously
received not only to prove in detail the subject matter of the
extensive farm, but its reasonable market value at the time of
the transfer to Wolpert; to show the original cost of property
together with the value of improvements installed within a
period of two years is, in the circumstances of this case, an
entirely proper method of attempting to establish evidence of
value at the time of the sale in the absence of intervening
facts. The receipt of such evidence was discretionary and it
does not establish reversible error.

THE COURT PROPERLY RULED THAT THE NOTES OF THE
WITNESS MITCHELL WERE NOT ADMISSIBLE.

 The appellants called William B. Mitchell to the
witness stand and questioned him concerning his meeting
with Messrs. Wolpert and Vogelsang on February 9, 1958,
which led to the preparation by him of the contract relative
to the transfer of the ranch. The witness refreshed his
recollection from notes which he had made at the time of the
conference. Appellants' counsel sought to introduce the notes
as independent evidence supporting his testimony but the
trial court properly sustained the objection to the writing.
 As is said in Witkin, California Evidence, section 597,
page 650: "*Writing Itself Not Admissible.* Under this rule the
writing has no purpose or function other than to refresh the
memory of the witness; it is not admissible in evidence at the
instance of the party whose witness is using it, and it has no
independent evidentiary value. (*Estate of De Laveaga*
(1913) 165 Cal. 607, 631 [133 P. 307]; *Estate of Packer*
(1913) 164 Cal. 525, 530 [129 P. 778] ['To permit this to be
done by the party producing the witness would open the door
to the admission of hearsay and manufactured evidence with-
out limit']; ..." (See also *Hawkins* v. *Sanguinetti,* 98
Cal.App.2d 278 [220 P.2d 58]; *People* v. *McNichol,* 100
Cal.App.2d 554 [224 P.2d 21]; *People* v. *Keelin,* 136 Cal.
App.2d 860 [289 P.2d 520, 56 A.L.R.2d 355].)

McBaine, California Evidence Manual, second edition, sec-
tion 296, page 101, covers the same situation: "When a party
produces a witness who uses a writing to revive present recol-

lection, or as a record of past recollection, the writing may not be introduced in evidence by that party.''

It is true that after a witness uses notes on the stand in testifying relative to a previous transaction, the opposing side may read the contents of the documents to the jury (Code Civ. Proc., § 2047). (See *Inouye* v. *McCall*, 35 Cal. App.2d 634 [96 P.2d 386]; *Souza* v. *Joseph*, 22 Cal.App. 179 [133 P. 981]; *Kelliher* v. *Ray*, 43 Cal.App.2d 252 [110 P.2d 712].) But that was not the situation here, and the court's ruling was correct.

### The Testimony Elicited From the Witness Hughes Was Hearsay.

 Appellants sought to introduce in evidence what it is claimed that the witness Hughes had once heard said by Mr. DeLong of the California Cattle Security Company with respect to his intention to bring a criminal charge against Clarence Vogelsang for the sale of mortgaged cattle. This was pure hearsay, and the objection to it was properly sustained. This conclusion is not weakened by the cases cited by appellants; *Dussault* v. *Condon*, 170 Cal.App.2d 693 [339 P.2d 896], permitted a police officer to testify to what he had heard an informer state as to the facts upon which he made an arrest; and in *Werner* v. *State Bar*, 24 Cal.2d 611, 621 [150 P.2d 892], evidence of what Mrs. Werner said was properly received because she was a representative of her defendant husband and her acts and statements were independently valuable.

### Evidence of Poverty of a Plaintiff Was Improper.

 The plaintiff, Erma Vogelsang, testified that her husband died of a heart ailment at the age of 65 during the early part of the year 1959, and she also stated that she had to go to work after that time by caring for children from which latter fact an inference could be drawn that lack of funds required her to do so.

Proof of the death of the husband was requisite as his executrix was a party; the fact that he died of a heart attack and had been worried about the situation that resulted from the disposition of the ranch was harmless.

However, a different viewpoint can be urged with respect to the inferential proof of poverty of Mrs. Vogelsang. The court twice sustained objections to inquiries as to whether she was self-supporting, but when this specific question was

asked and the answer given, the court overruled the objection.

"MR. WAGNER: Q. What did you do . . . before you moved to the house you live in now?

". . . . . . . . . . . . . .

"THE WITNESS: I was taking care of some children. Right after my husband died, why I had to go to work I didn't have a home, and after he passed away, why I had to go to work, and I took care of children."

█ Proof of the adverse financial condition of a plaintiff in a suit of this kind is not proper in California. (55 Cal.Jur.2d, § 72, pp. 481-482.) █ It was, therefore, erroneous to receive such evidence, but the question remains whether the ruling was so prejudicial in this particular case as to require a reversal; we conclude that in the circumstances, with the record containing ample evidence about the adverse financial condition of the plaintiffs at the time of the transfer of the property and a full recounting of their activities during the period in question, no possible adverse effect could be derived from the error in the trial by the court and that it was not so prejudicial as to require a reversal (Cal. Const., art. VI, § 4½).

No Error In the Findings Would Justify a Reversal.

The appellants find various alleged mistakes in the findings. They point out that in some minor particulars there are conflicts and, that all of the minor issues set up in the pleadings are not concluded. For the most part, these objections are trifling in character and none of them constitutes reversible error.

█ At the outset, it should be observed that there were seven causes of action in the complaint and that every possible theory was incorporated which might conceivably be the basis for the relief of the plaintiffs. The court adhered to one theory only, namely, that there was fraud in procuring the transfer of the properties to the defendants. Therefore, findings on the basic allegations of any of the other causes of action were rendered unnecessary. This observation eliminates some of the objections made by the appellants.

Further, a curious event took place after the entry of the judgment; the motion for a new trial made by the defendants adequately covered all of the claims now advanced. Before a ruling by the trial court, the defendants suddenly withdrew their motion (*Stoyell* v. *Cole,* 19 Cal. 602) and contemporaneously appealed the case to the District Court of Appeal.

Thereafter, the plaintiffs moved for an order striking the "Abandonment of Motion for New Trial" and requested the court to vacate the findings and judgment pursuant to section 662 of the Code of Civil Procedure, to award the plaintiffs an equitable lien upon the real property and to increase the damages. The court ruled adversely to plaintiffs' contention holding that while "... the Trial Court should have been given the opportunity to correct any errors [in the findings] as claimed by the defendants, if such they were" the withdrawal of the motion for a new trial was within the discretion of the defendants.

 We believe that the trial court was correct in its conclusion; the withdrawal of the motion for new trial was within the power of the appellants. However, certain commonsense conclusions result from the action of appellants. For one thing, no question of excessive damages can be raised for the first time on appeal (*Bate* v. *Jolin*, 206 Cal. 504 [274 P. 971]; *People* v. *Alves*, 123 Cal.App.2d 735 [267 P.2d 858]). It would also seem to follow that appellants are now estopped in good conscience to allege minor imperfections of the findings as a ground for reversal. In our system the trial court is afforded a final opportunity to adjust the form and contents of the findings through a ruling upon motion for a new trial (Code Civ. Proc., § 662). Appellants initiated that procedure, but for some good reason known only to themselves, they abandoned the remedy after full argument. As a consequence, the orderly conduct of the litigation with respect to the findings was interfered with by the appellants and they should not be allowed now to pick minor flaws and contend that there should be a reversal based upon them. Good faith should presuppose a continued repair in the trial court to the provisions afforded by law for the amelioration of minor mistakes.

 The amendment of section 634 of the Code of Civil Procedure in 1959 did not change the essential procedure with respect to proposed findings insofar as appellants' objections are concerned. By that section, a party dissatisfied with the findings suggested by the prevailing party has the opportunity to file objections, proposed counterfindings, and requests for special findings. The section, of course, does not require the adoption of any of such proposals. While it is the court's duty to disclose its determination of all of the applicable issues, this does not require a substitution of

findings based on evidentiary facts rather than ultimate facts.

The trial court in some instances has found that the allegations of certain numbered paragraphs of the complaint are true. This type of finding has been frequently approved in the past where the allegations referred to are clear and specific, as in the present case. (*Popescu* v. *Popescu,* 46 Cal.App.2d 44, 53 [115 P.2d 208]; *Larsen* v. *City & County of San Francisco,* 152 Cal.App.2d 355, 369 [313 P.2d 959]; *Mercurio* v. *Department of Alcoholic etc. Control,* 144 Cal. App.2d 626, 636 [301 P.2d 474].) It is still the rule.

We have examined with care all of appellants' objections to the findings and have determined that none of them constitutes reversible error.

THE COMPLAINT RELATIVE TO AN INCOMPLETE TRANSCRIPT WAS OBVIATED

Appellants complain that the trial court did not permit the inclusion in the reporter's transcript of the original proposed findings of respondents. This complaint, if it had any value, has been obviated through a stipulation augmenting the record on appeal to include such proposed findings.

THE TRIAL JUDGE WAS NOT GUILTY OF MISCONDUCT

In their reply brief, appellants finally say that they believe the trial judge was prevented from rendering a proper judgment ''by emotional factors which he was unable to eliminate from his thinking and which were not justified by the evidence.'' This would not be the first time that unsuccessful litigants persuaded themselves that the trial judge was prejudiced against them. We have examined with particularity the 1,325 pages of the reporter's transcript, the clerk's transcript and the briefs and we find no support for appellants' contention.

While there are minor errors in the record, as previously stated, we hold that there is no justification for a reversal. (Cal. Const., art VI, § 4½.)

The judgment is affirmed.

Brown (R.M.), J., concurred.

Stone, J., deeming himself disqualified, did not participate.