[Civ. No. 23506.   First Dist., Div. Two.   Dec. 19, 1967.]

OSCAR C. WILKE et al., Plaintiffs and Appellants, v. COINWAY, INC., Defendant and Respondent.

Gerald J. Kilday for Plaintiffs and Appellants.

Ralph Irby White for Defendant and Respondent.

TAYLOR, J.—On this appeal by plaintiffs, Oscar and Kathryn Wilke, from an adverse judgment in their action to rescind for fraudulent representations a contract for the purchase of 30 coin-operated testing devices from defendant, Coinway, Inc., a California corporation (hereafter Coinway), the only question is the sufficiency of the evidence.

The record reveals the following facts. In 1961, plaintiffs, husband and wife, were 68 and 63 years old, respectively, and living in Burlingame. Neither of them had ever had any business experience of any kind. Plaintiff, Oscar Wilke, although employed at that time as a shop superintendent in an aircraft plant, was contemplating retirement; his wife was a homemaker. They were interested in something to supplement their retirement income and began to follow the business opportunity advertisements in the newspapers. Mrs. Wilke answered a blind (telephone number only) advertisement placed by Coinway by calling the number given. The person who answered identified himself as Mr. Hayden, indicated that he did not wish to discuss the matter over the telephone but wanted to discuss the details in person, and made an appointment for the following evening (June 8).

At that time, Mr. Reed and Mr. Williams, then agents and employees of Coinway, called on plaintiffs at their home and showed them a Reactometer. The Reactometer is neither a vending machine nor a coin-operated amusement device but a testing machine to ascertain a person's reflexes and his ability to respond. The player inserts a nickel in the Reactometer. A light goes on and then the player presses a second button that activates a spring device that releases after a certain amount of time, and the player measures his reaction in terms of a chart on the machine.

Reed and Williams explained to plaintiffs that they would have the first and exclusive rights to the Reactometers, and mentioned the total price of $4,968.90 for 30 machines installed at locations selected by Coinway and all that plaintiffs would have to do would be to drive around over the week-

end in their spare time, collect the coins, and keep the machines in operation by making necessary repairs and replacing worn-out batteries and other parts.

Reed and Williams indicated that there was some urgency in closing the deal as there was great demand for the machines. Although they could not accept a personal check, the payment of $1.00 in cash would hold the deal until plaintiffs obtained a cashier's check. Accordingly, plaintiffs paid $1.00 down and signed a pink document that they were told was not a contract, but a receipt. In fact, the document they signed on June 8 was a conditional sales contract for equipment for business use, providing for the purchase of 30 Coinway Reactometers, 30 banks of $5.00 worth of nickels to be supplied to each location, 30 spotlights installed, one at each location, and 30 locations subject to approval, for a price of $4,950, plus sales tax of $18.90, a total of $4,968.90.

The following day, June 9, Reed and Williams returned and plaintiffs signed a document entitled "Purchase Order" for 30 Reactometers, plus an extra one for spare parts at a unit price of $150.92 each, including spotlights, etc., for $4,521.60, plus sales tax of $180.90, making a total cash price of $4,702.50.[1] They gave Mr. Reed a certified check for this amount. The purchase order signed by both plaintiffs contained the location provision and other provisions set forth below,[2] as well as a general disclaimer provision, likewise set

[1]Plaintiffs noted the over $200 discrepancy between this price and that on the pink document signed the previous day but assumed they were being given a slight discount for paying cash. Mr. Reed also indicated that he had made a mistake in the amount of the tax on the pink document, but would credit them for the amount of his mistake because they were buying so many machines.

[2]"It is a condition of this order that the seller will procure in the name of the purchaser locations and location contracts for all of said machines. The purchaser hereby appoints the seller as his agent to procure said locations and location contracts subject to the purchaser's right to object thereto as hereinafter stated. A representative of the seller will accompany the purchaser to each location. The purchaser has the right to reject any location and/or location contract submitted for his consideration provided that the purchaser will not object unreasonably. The purchaser will accept in writing the locations and the location contracts approved by him and such acceptance shall be deemed acknowledgement by purchaser of full satisfaction of the obligation of the seller respecting procurement of locations and location contracts and shall be final as between purchaser and seller. Thereupon, purchaser will hold and keep seller free and harmless of any claim or demand by or on behalf of any location on or arising out of the location contract. Purchaser acknowledges that there have been no representations or guarantees of profits from these machines.

"Subject to shipment conditions, availability of labor and materials, and other matters beyond seller's control, all machines covered by this purchase order will be delivered to the respective locations promptly upon

forth below.[3] At the time of the execution of the document dated June 9, plaintiffs were given a copy of ''Coinway's Exclusive Reactometer''[4] and ''10 Reasons,'' likewise set forth below.[5]

Coinway ordered the 30 machines purchased by plaintiffs on June 19 and received them by the end of the month. Thereafter, Coinway employed one Mather, as well as Reed and Williams, to obtain locations for the machines.

Plaintiffs first met Mr. Hayden, the president of Coinway, when they went to the Oakland office of the corporation on

acceptance by purchaser (pursuant to the preceding paragraph) of the full route of locations. Seller at its own expense will thereupon install said units and make ready for use. And install spotlites in each.

''Upon delivery and installation of all machines, purchaser will accept in writing, reciting that the machines are on location.

''Purchaser accepts full responsibility for any and all licenses as may be required.

''All checks are to be made payable to Coinway, Inc.''

[3] ''The purchaser fully understands that this purchase order is complete in itself and cannot be rescinded; that it contains all of the terms of the agreement between the purchaser and this company; that he is not relying on any representations, promises or warranties made by any one, either verbal or written, not contained and printed here; and this purchase order is submitted to the company with payment, in reliance thereon.''

[4]       ''COINWAY'S EXCLUSIVE REACTOMETER

What COINWAY Does for You

1. We pay Freight from Factory.
2. We open, adjust and check each Machine.
3. Our Professional Location Engineers Solicit and secure in your behalf Locations and Location Contracts for your Machines and these Locations are subject to your approval.
4. When Locations are approved by you, our Service Men deliver Machines, install them on the Wall and give them a final Check Out.
5. We install an Electric Spotlight on the Wall, throwing a nice spot right on the Machine.
6. We give each Location Owner $5.00 in marked nickels to stimulate Play, this $5.00 Bank is your property.
7. We train you in the Operational and Promotional aspect of the Reactometer to further assure your Success.

What You Have To Do

1. Make the Collections periodically, settle with the Owner and Stimulate play.''

[5] ''10 Reasons     That Make The Operation of . . .

AUTOMATIC MERCHANDISERS

Unusually Profitable and Powerful

1. It's strictly cash business, no credit risks.
2. You have no overhead. You can operate from home, just paying a small amount to the location owner.
3. You can start a business with a small capital and gradually build it up to give you any desired income.
4. You are your own boss. The harder you work, the more you make.
5. Automatic merchandisers are 'SILENT SALESMEN'. They are on the

June 24. At this time, he demonstrated the use of the Reacto-meter to them and told them that the locations were being selected. Plaintiff, Oscar Wilke, accompanied a Coinway mechanic to the installation of the first two machines. At the first location, Walt's Place, despite the signed location agreement dated July 28, 1961, the owner would not permit the installation and said he had not heard the entire deal. Although Mr. Hayden testified that all of the machines were installed by August 7, the earliest of the location agreements signed by the bar owners (a necessary prerequisite to the installation of the machines) is dated July 28, 1961, and the latest August 31.

By these agreements, the owner of the location, usually a bar, agreed to permit the installation of a Reactometer in return for 50 percent of the gross receipts. Plaintiffs were to furnish a $5.00 bank of nickels for promotional purposes, to take from the collections sufficient revenue to reimburse the location for all license requirements, and that the agreement could be cancelled by either party at any time.

On August 7, 1961, plaintiffs again went to the Coinway offices in Oakland and signed three location acceptance agreements for the 30 locations provided by defendant. Each of the location acceptance agreements provided that it was understood and agreed that there are no guarantees as to the income from any of the locations. Of the 30 locations, 18 were in San Francisco, 4 in South San Francisco, 2 in Redwood City, 1 in Daly City, and the remaining 5 in San Mateo. Although all of the machines had not yet been installed, plaintiffs were asked to sign the acceptance agreements so that Coinway could pay its location men and so plaintiffs would not again have to make a trip to the Coinway office in Oakland.

Sometime thereafter, the installation of all 30 machines was

job constantly day and night, Summer and Winter, Sundays and Holidays.

6. You have light, pleasant, out-door employment in an unusually profitable business.

7. You have a depression-proof business. Standard, nationally advertised products are always in demand and are universally purchased.

8. You do not cater to just one class, but to every one, rich, poor, men, women, boys; every one uses these wanted and nationally advertised brands.

9. No long hours! No hard, laborious work! No time clocks to punch! You are your own boss. You work when you please and stop when you please.

10. No waiting for a month, six months or a year or more to build up a business! Instead, you are in business the first day your merchandisers are on location.''

completed and plaintiffs commenced their collections. From August 8, 1961, until January 19, 1962, when plaintiffs regularly made collections, they received a total amount of $360.10. Since most of the locations were in San Francisco, plaintiffs discovered that the time required to service them was quite extensive. Working all day on Saturdays and Sundays from 8 a.m. until dark, without any time off for lunch, they could only cover 8-10 locations a day. Because the amount of time involved was so great and the take so small, plaintiffs could not make their collections more often than once every two weeks. In addition, as all of the premises were bars, they were not open until noon on the weekends and many times machine parts had to be replaced or cleaned, a time-consuming matter.

Plaintiffs continually complained to Coinway about their difficulties with the collections from the machines and were told by Mr. Hayden that they should change the locations of the Reactometers. Hayden testified that in order to make the machines productive, plaintiffs would have to periodically find new locations and that the solicitation of new locations required a sales ability which he thought plaintiffs were capable of at the time they received the machines, but he subsequently realized they did not have. He offered to have his son help them find new locations. He also helped plaintiffs draft an ad to be placed in the newspapers to sell the Reactometers.

On January 13, 1962, plaintiffs made their last collections and then gave up as it was not worth the expenditure of gasoline. However, even prior to that time, some of the Reactometers previously installed had been taken out either at the direction of the proprietor of the premises or because there was no money in the machines. At the time of trial, all but a few of the machines were in plaintiffs' garage, along with 3 others that Hayden gave them when he went out of the Reactometer business. At the time of trial, 3 of the machines had been abandoned at their respective locations.

Hayden testified that he was the president of Coinway, a closed corporation owned by him, his wife and son. He had been exclusively in the coin vending machine business since 1950 but his experience was limited to selling the machines. He promised and gave plaintiffs an exclusive franchise for the Reactometers but did not so state in any of the written agreements. He had no experience with vending or coin machine routes, their servicing, potential income, etc. He had had no

experience with Reactometers, but first heard of them from Reed in the spring of 1961. Reed and Williams were employed by him from May until about the end of November 1961 to sell Reactometers. He did not answer plaintiffs' original telephone call but Reed and Williams had the authority to do so.

Coinway sold a total of 50 Reactometers in 3 transactions that were all consummated in June 1961, with the 30 machines sold to plaintiffs representing the major sale as each of the other 2 buyers had purchased 10 machines. Coinway had no complaints from them and he did not know whether they were still in operation at the time of trial. Although not legally obligated to do so under the terms of the contract signed by plaintiffs, Hayden felt morally obligated to spend $200 to defend a licensing proceeding involving one of the machines which had been removed by a law enforcement officer. He was not familiar with 27 of the 30 locations provided for plaintiffs but had paid a location finder $20 for obtaining each one. His total cost for each Reactometer sold to plaintiffs for $150.92 each was about $80, broken down as follows: $45 to the manufacturer; $20 to the location finder for each location; $7.95 for the lights; and $12 for the painting and installation of each machine.

Plaintiffs' expert witness, Mr. Blum, who had many years of experience with coin-vending and coin-operated amusement machines and with the servicing and income capability of such machine routes, testified that the reasonable value of the Reactometers sold to plaintiffs was about $25-30 each. In his opinion, the Reactometer, as distinguished from an amusement device or automatic vending machine, was a testing machine, basically an adult toy, with a very short location life. A Reactometer might attract players when new, like any toy, but would not attract the interest of the public for a very long time except perhaps in locations like bus stations with a large group of transient patrons. The operation of a route of Reactometers could not be profitable as a business because of the time, physical effort, and labor necessary in locating and constantly relocating the machines. To obtain new locations, solicitors would have to be employed. To realize even the expenses of servicing the Reactometers, a minimum of 40 hours of work a week would be required, but it would still not be an economically productive venture because of the nature of the machines.

In May 1962, plaintiffs contacted an attorney, who on June

wrote to Coinway concerning rescission of the agreement. After Coinway's refusal, plaintiffs filed this action on January 21, 1963.

The trial court found that prior to the execution of the agreement of the parties, the agents of Coinway made the following representations to plaintiffs concerning the Reactometers and the use to which they could be put: 1) that plaintiffs could operate the route of public places in which the Reactometers were to be installed on a part-time employment; 2) that plaintiffs would not have to work long hours or at hard laborious work but would have light, pleasant, out-of-door employment; 3) that plaintiffs would have an immediate source of income without waiting for a month, six months or a year to build up business; 4) that the locations selected would be productive of income; and 5) that each of the machines was reasonably suited for the production of supplementary income.

The court further found that Coinway had fully performed all of the conditions of the contract; that plaintiffs came into possession and control of the Reactometers on or about August 7, 1961, and had every opportunity of ascertaining the truth or falsity of any statements or representations made by Coinway or its officers previous to the execution of the contract; that plaintiffs continued to operate the Reactometers with every opportunity of ascertaining the truth or falsity of the matters alleged in their complaint; that they so mismanaged and negligently operated them as to destroy all customer good will, interest, as well as the value of the locations where the Reactometers were in operation, thus breaching the numerous contracts with each location; and that plaintiffs retained the benefits of the contract and all moneys received from the operation of the Reactometers.

At the request of plaintiffs, the court also made a special finding that neither of them had prior experience in the operation of coin-operated machines or routes of same, and were lacking in any business experience, and entered its judgment in favor of Coinway. The only question on this appeal is the sufficiency of the evidence to support the judgment.

We have read the testimony carefully in an effort to discover some substantial evidence to support the findings of the trial court and are unable to do so. The positive testimony of plaintiffs as to their reliance upon and belief in the representations made and their testimony that they expected a source of supplemental income therefrom, is not disputed. The

uncontroverted evidence establishes that Reed and Williams, the admitted agents of Coinway, represented that the Reactometers could be a source of supplemental income. Hayden, the president of Coinway, a closed family corporation, testified that his experience was limited to the selling and servicing of vending and coin-operated machines and that he had no experience with the income capability of the machine routes or the operation of such routes.

The testimony of plaintiffs' expert that the locations selected, although good ones, were too far apart for economically feasible servicing, further demonstrates Coinway's lack of experience with the actual operation of such routes. Thus, there is no testimony in the record contrary to that of plaintiffs' expert that the Reactometer was not an economically feasible source of supplemental income as the machines would have to be moved too frequently and that it would take a minimum of 40 hours of work a week to even meet the demands of servicing a route of such machines.

The applicable rules were aptly summarized in *Cortez* v. *Weymouth*, 235 Cal.App.2d 140 at page 151 [45 Cal.Rptr. 63] as follows: ■ " 'It is well established in California and other jurisdictions that a person who has been induced by fraudulent misrepresentations to enter into a contract or to make a conveyance may have the contract or conveyance set aside and secure a restitution of those benefits lost to him by the transaction. [Citations.] ■ A fraudulent misrepresentation is one made with the knowledge that it is or may be untrue, and with the intention that the person to whom it is made act in reliance thereon. [Citations.] ■ It must appear, however, not only that the plaintiff acted in reliance on the misrepresentation but that he was justified in his reliance. . . . ■ He may not justifiably rely upon mere statements of opinion, including legal conclusions drawn from a true state of facts. . ., unless the person expressing the opinion purports to have expert knowledge concerning the matter or occupies a position of confidence and trust. . . . If, however, the opinion or legal conclusion misrepresents the facts upon which it is based or implies the existence of facts which are nonexistent, it constitutes an actionable misrepresentation. . . .' ''

■ The representation need not be made with knowledge of actual falsity, but need only be an assertion as a fact of that which is not true, by one who has no reasonable ground for believing it to be true (*Gagne* v. *Bertran*, 43 Cal.

2d 481, 487 [275 P.2d 15].) ■ The representation here made by Coinway's agents that the Reactometers at the selected locations could be a source of supplemental income clearly falls into this category as Coinway had no experience with Reactometers or with the servicing and income experience of such routes. The representation was clearly unjustified.

Coinway argues, however, that the representations here made were mere predictions as to future income and, therefore, could not be the basis for a rescission of the contract for fraud. We cannot agree. A statement of fact, not based on any knowledge on the part of the seller, is, in the eyes of the law, a fraudulent misrepresentation (Civ. Code, § 1572). ■ The general and well settled rule is that when a representation concerning the subject matter of a transaction which might ordinarily be only the expression of an opinion is asserted as an existing fact, material to the transaction, and which has a reasonable tendency to induce one of the parties to the transaction to consider and rely upon such representation as a fact, the statement then becomes an assertion of an existing fact within the meaning of the general rule as to fraudulent misrepresentations (*Harris* v. *Miller*, 196 Cal. 8 [235 P. 981]; *McMahon* v. *Grimes*, 206 Cal. 526 [275 P. 440]).

■ As stated in *Dyke* v. *Zaiser*, 80 Cal.App.2d 639 [182 P.2d 344], an expression of opinion which is untrue and which is not honestly entertained and which, when considered with other inducements, proves to be false and is material to the transaction, may constitute fraud. Furthermore, such an expression of opinion may amount to fraud where it is accompanied by active misrepresentation or relates to a subject as to which the parties have no knowledge or means of ascertaining the proof. ■ The general rule is that one has a right to rely on statements of material facts essentially connected with the substance of the transaction where one of the parties is ignorant or inexperienced in regard to matters concerning which material misrepresentations are made, and such ignorance is known to the other party, who is also aware that reliance is being placed on his representation and that the facts are not and cannot be expected to be within the first party's knowledge. ■ Here, it is undisputed that plaintiffs were completely ignorant of all business matters and relied on the representations made by the admitted agents of Coinway. The materiality of the representation here made cannot be questioned as the uncon-

troverted evidence indicates that plaintiffs were interested in a source of supplemental income during their retirement and were induced to sign the contract on that basis.  ██  One material false statement is sufficient ground for rescission (*White* v. *Financial Guar. Corp.*, 13 Cal.App.2d 93 [56 P.2d 550]).

██  What would constitute fraud in a given instance might not be fraudulent when exercised toward another person. The test of the representation is its actual effect on the particular mind, whether it is a strong and circumspect mind, or one weak and too relying (*Vogelsang* v. *Wolpert*, 227 Cal. App.2d 102 at p. 112 [38 Cal.Rptr. 440]).  ██  Here, plaintiffs were elderly and inexperienced in business, seeking a supplemental source of income and subjected to a series of high pressure sales tactics in the privacy of their own home. They were not purchasing the Reactometers for their intrinsic value but were purchasing the machines and the route of 30 selected locations with the expectation of obtaining supplemental income.  ██  The testimony of their expert witness that the Reactometers were of questionable profitability and that in any event it was not an economically feasible operation on a part-time basis, is uncontroverted. Here, the representations that the Reactometers were a profitable part-time source of income was a positive misstatement of fact by the agents of Coinway which admittedly had no experience or basis for such a representation.

██  As direct proof of fraudulent intent is often an impossibility, fraud may be established by the circumstances surrounding the transaction (*Vogelsang* v. *Wolpert, supra*). Fraud is not generally practiced in the open light of day and for that reason is not susceptible of direct proof but must be spelled out from circumstantial evidence.

██  As to the circumstances surrounding the transaction, we need here list only a few of the uncontroverted facts accompanying the sale of the Reactometers to plaintiffs: the inital "blind" advertisement placed by Coinway; the eagerness for an immediate personal contact and insistence that the agreement be consmmated immediately with the $1.00 downpayment because of the great demand for Reactometers; the indication that the pink document signed by plaintiffs on June 8 was merely a receipt, when, in fact, it was a conditional sales contract; the insistence on a cashier's check; the oral promise of an exclusive franchise without any enforceable written indication thereof; the distribution to plaintiffs at the time of the signing of the agreement of literature supporting the ini-

tial representation, "Coinway's Exclusive Reactometer," quoted in full above at footnote 4, and literature implying that a Reactometer was like an automatic merchandiser of nationally advertised products ("10 Reasons," quoted in full above at fn. 5), as well as the discrepancy between the reasonable value of each machine ($25-$30), its cost to Coinway (about $80), and the price paid by plaintiffs ($150.92).

A false representation as to income or profits from a business can be the basis of rescission (*Rogers* v. *Bill & Vince's, Inc.*, 203 Cal.App.2d 292, 294 [21 Cal.Rptr. 269]). Here, the representation to plaintiffs that the 30 Reactometers installed in the locations selected by Coinway could be a source of supplemental income when, in fact, a full-time servicing of the route would only recoup the expenses of servicing the route and without any indication of the constant relocation required for this kind of machine, is certainly in the same category as the misrepresentation of the daily receipts of the restaurant involved in the *Rogers* case, *supra*. Furthermore, as there stated at page 298, where the representation has to do with the volume of business, income or profits, and the facts are peculiarly within the knowledge of the seller, the buyer is entitled to rely on such statements and is not bound to make an independent investigation.

*Alexander* v. *State Capitol Co.*, 9 Cal.2d 304 [70 P.2d 619], held that a forecast or statement of opinion as to future dividends constituted actionable fraud. *H. W. Smith, Inc.* v. *Swenson*, 105 Cal.App. 60 [286 P. 1050], is to the same effect. In *Smith,* the court placed particular emphasis on the fact that there, as here, the representation implied that the seller had knowledge of facts on which to base his assertion.

Obviously, to the prospective purchaser of a business, a representation that it can make a profit is of the utmost materiality and was, in this instance, the one substantial inducement to entering into the contract. (Cf. *Eck* v. *McMichael,* 176 Cal.App.2d 368, 370 [1 Cal.Rptr. 369]). Nor can it be denied that the statement of a seller, who has superior knowledge of the income potential of a business, does influence the sale if only to quiet the mind of the purchaser. (Cf. *Pearson* v. *Norton,* 230 Cal.App.2d 1, 9 [40 Cal.Rptr. 634].)

While we have found no authority in this state relating to fraud in the precise kind of transaction here involved, *Mason* v. *Vogue Knitting Corp.* (1960) 361 Mich. 481 [105 N.W.2d 412], is helpful. In that case, the court found sufficient fraud in the seller's representations that earnings could be derived

from the operation of their knitting machines for two or three hours a day. Long ago, the U. S. Supreme Court noted that "no scheme of investment which must ultimately and inevitably result in failure can be called a legitimate business enterprise" (*Public Clearing House* v. *Coyne,* 194 U.S. 497, 515 [48 L.Ed. 1092, 1101, 24 S.Ct. 789]).

Fraud being here established by uncontroverted evidence, as a matter of law, the court erred in denying to plaintiffs the relief requested. ▮ Coinway, however, argues that the trial court properly denied the rescission since plaintiffs were guilty of unreasonable delay. The uncontroverted evidence indicates that during the first five months, plaintiffs obtained a total of $360.10 from the 30 machines, after splitting the take with the bar owner, and after that they did not obtain enough to recoup their expenses of collection. As indicated in the statement of facts above, plaintiffs attempted to service the Reactometers for several months. By the middle of January 1962 (about six months after all of the machines had been installed and were in operation), they had knowledge of the fraud, but did not consult an attorney until May 1962. His letter seeking rescission was written on June 1, 1962. Since the 1961 amendments of sections 1691 and 1693[6] of the Civil Code, reasonable diligence or promptness on the part of the party seeking rescission is no longer a prerequisite for the remedy. The new requirement is essentially one of freedom from laches. Its application depends on whether, under the particular facts, the delay has in any way prejudiced the defendant (*Hil-Mac Corp.* v. *Mendo Wood Products, Inc.,* 235 Cal.App.2d 526 [45 Cal.Rptr. 396]). In the instant case, there was no evidence indicating that plaintiffs' offer to return the machines to defendant as late as June 1962 was in any way prejudicial to Coinway. Thus, there was no evidence to support the trial court's finding of unreasonable delay, and it was error to deny plaintiffs the relief requested (*Eck* v. *McMichael, supra*).

The judgment is reversed with directions to the trial court to enter judgment in favor of plaintiffs in the light of this opinion, and to determine the amount of consideration to be returned to plaintiffs by Coinway.

Shoemaker, P. J., and Agee, J., concurred.

---

[6]Section 1693, so far as pertinent, provides: "When relief based upon rescission is claimed in an action or proceeding, such relief shall not be denied because of delay in giving notice of rescission unless such delay has been substantially prejudicial to the other party."